Filed 7/21/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| ELIZA GILKYSON et al., | B300971 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. EC061586) |
| v. | |
| DISNEY ENTERPRISES, INC., et al., | |
| Defendants and Appellants. | |

APPEALS from a judgment of the Superior Court of Los Angeles County, William D. Stewart, Judge.  Reversed with directions.

Hunter Salcido & Toms, John L. Hunter; Law Office of Craig Barker and Craig Barker for Plaintiffs and Appellants Eliza Gilkyson, Tony Gilkyson and Nancy Gilkyson.

Sidley Austin, Rollin A. Ransom, David R. Carpenter and Sheri Porth Rockwell for Defendants and Appellants Disney Enterprises, Inc. and Wonderland Music Company, Inc.

———————————

A jury awarded Eliza Gilkyson, Tony Gilkyson and Nancy Gilkyson, the adult children and heirs of songwriter Terry Gilkyson, $350,000 based on its finding that Disney Enterprises, Inc. and its music publishing subsidiary, Wonderland Music Company, Inc., (collectively Disney) had failed to pay contractually required royalties in connection with certain limited uses of "The Bare Necessities" and several other Gilkyson-composed songs in home entertainment releases of Walt Disney Productions's 1967 animated film The Jungle Book. Following the jury's verdict the trial court, ruling on the Gilkyson heirs' cause of action for declaratory relief, awarded an additional $699,316.40 as damages for the period subsequent to the jury's verdict through the duration of the songs' copyrights.

On appeal Disney contends it was entitled as a matter of law to judgment in its favor because its agreements with Gilkyson require payment of royalties only in an amount equal to 50 percent of net sums received by Wonderland for exploitation of the mechanical rights to the material Gilkyson composed and no such sums were received for the home entertainment releases of The Jungle Book after July 2009. Alternatively, Disney argues the trial court erred in awarding contract-based damages as part of the declaratory relief cause of action.

In a cross-appeal the Gilkyson heirs argue the trial court erred in denying their request for prejudgment interest. They also conditionally appeal the trial court's denial of their motion for a new trial on damages alone and for additur, in which they had argued the amounts awarded by the jury and the trial court were inadequate and not supported by substantial evidence. However, explaining they are prepared to accept the judgment as entered (plus prejudgment interest) to put an end to the

2

litigation, the Gilkyson heirs ask us to reverse the ruling on their new trial motion only if we reverse the damage award on their declaratory relief cause of action.

We agree with Disney that interpretation of its agreements with Gilkyson is subject to de novo review; Gilkyson's right to receive royalties from exploitation of the mechanical reproduction rights in "The Bare Necessities" and other songs he wrote for The Jungle Book was dependent on Wonderland receiving payment for such exploitation; and the express language of the contracts granted Disney sole discretion to decide how to exploit the material, including whether a fee should be charged for Disney's own use of the material in home entertainment releases. Accordingly, we reverse the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *The Songwriting Agreements*

Walt Disney Productions, Disney Enterprises's predecessor-in-interest, commissioned Gilkyson in 1963 to write songs for potential use in its anticipated animated motion picture The Jungle Book. The parties entered into a series of single-song contracts that are identical except for the names of the songs and the dates. Only "The Bare Necessities" was actually used in the motion picture, which was first released in theatres in 1967.[1] However, demo recordings made by Gilkyson of six other songs

---

[1] As we recounted in *Gilkyson v. Disney Enterprises, Inc.* (2016) 244 Cal.App.4th 1336, 1338, footnote 1, in 1968 Gilkyson received an Academy Award nomination for best original song for "The Bare Necessities" and a Grammy Award nomination, along with Richard M. Sherman and Robert B. Sherman, for best recording for children.

(referred to at trial as the deleted songs) were ultimately used with bonus features in certain of the home entertainment releases of The Jungle Book.

Each contract provided "the material," defined as "original lyrics and/or music (including any and all melodies, lyrics and music written by you hereunder)," was written as a work for hire, which meant Walt Disney Productions was the author and owned all rights.  The contracts authorized Walt Disney Productions to assign the material to its wholly owned subsidiary, Wonderland.  As consideration, Gilkyson received an initial fee of $1,000 and specified royalties for sales of sheet music and for licensing or other disposition of the mechanical reproduction rights.  Specifically, paragraph 6 of each agreement provided, "We agree that in the event any of such material so written by you as a work made for hire shall be published by us or be licensed by us to be published in any of the media set forth in Subparagraphs (a), (b) and (c) below, you shall be entitled to receive (in addition to the amount mentioned in Paragraph 5 hereof) royalties from the publication of such material, as hereinbelow set forth:  [¶] (a) Five cents (5¢) for each regular piano copy and/or orchestration that is sold and paid for at wholesale in the United States of America and Canada; [¶]  (b)  An amount of money equal to Fifty Percent (50%) of all net sums received by our music publisher in respect of regular piano copies and orchestrations sold and paid for in any foreign country other than Canada; [and] [¶]  (c)  An amount of money equal to Fifty Percent (50%) of the net amount received by our music publisher on account of licensing or other disposition of the mechanical reproduction rights in and to material so written by you."

Paragraph 7 of the agreements described the limited nature of Gilkyson's royalty rights: "You shall be entitled to receive as royalties only the moneys and/or royalties stipulated in and in accordance with Paragraph 6 above; specifically excepting, excluding and reserving to us all revenue, emoluments and/or receipts received by and paid to us by virtue of the exercise of the grand rights, dramatic rights, television rights and other performance rights, including the use of the material in motion pictures, photoplays, books, merchandising, television, radio and endeavors of the same or similar nature."

Paragraph 10 again stated the limited nature of Gilkyson's rights and granted Disney sole discretion as to exploitation of the material: "You shall have no interest in any of the material other than your right to receive the royalties specifically agreed herein to be paid to you. Nothing contained in this agreement shall be construed as obligating us to publish, release, exploit or otherwise distribute any of the material, and the same shall be always subject to our sole discretion."

2. *Home Entertainment Release of The Jungle Book*

Over the years Wonderland paid Gilkyson and subsequently his heirs[2] a share of royalties based on licensing "The Bare Necessities" for soundtracks, album and single-song sales in media that included phonograph records, audiocassette tapes, compact discs and audio-file digital downloads and streaming. However, Disney paid no royalties when, beginning in 1991, The Jungle Book was first released in a home videocassette (VHS) format or thereafter when it was released on

---

[2] Gilkyson died in 1999.

LaserDisc, DVD, Blu-ray or other digital video formats for home entertainment use.

### 3. *The Gilkyson Heirs' Lawsuit and the First Appeal*

In 2013 the Gilkyson heirs sued Disney alleging Disney had breached its contractual obligation to pay the Gilkyson heirs per-unit royalties in connection with the use of Gilkyson's songs in the DVD version of The Jungle Book released in 2007 and on VHS tapes, which had been released at an earlier date.[3]

Disney demurred to the complaint. While insisting its contractual obligation to pay mechanical reproduction royalties excluded use of Gilkyson's songs in any audiovisual medium, for purposes of its demurrer it confined its arguments to claiming the Gilkyson heirs' causes of action were time-barred under the applicable statutes of limitations. In particular, emphasizing the allegation the DVDs had been released in 2007, Disney argued the Gilkyson heirs' claim for breach of written contract accrued no later than 2007, thus making the claim, first filed in 2013, untimely under the governing four-year statute of limitations. In addition, the release of VHS tapes had occurred decades prior to 2007. Accordingly, Disney argued any claim for failure to pay royalties accrued at the first breach of contract in the 1990's, leaving all claims time-barred.

---

[3] The lawsuit was originally filed in Texas on July 15, 2013. After Disney challenged the court's jurisdiction, the parties agreed the Gilkyson heirs would dismiss the Texas lawsuit and refile in California with any limitations period relating back to the July 15, 2013 filing date. Disney also agreed to identify the responsible corporate parties, and the Gilkyson heirs agreed to dismiss other corporate entities.

The trial court sustained Disney's demurrer, observing the claim for royalties began to accrue in 1991 when the VHS tapes of The Jungle Book were originally released and, at the latest, by December 31, 2007 when the DVDs were released. Under either scenario, the court ruled, the Gilkyson heirs' claims were barred by the four-year statute of limitations for written contracts. The court granted the Gilkyson heirs leave to amend.

On April 30, 2014 the Gilkyson heirs filed a first amended complaint asserting claims for breach of contract, breach of the implied covenant of good faith and fair dealing and declaratory relief. The amended complaint contained similar allegations as the original complaint but added that Disney had released The Jungle Book 2 in 2008 and re-released The Jungle Book (a Diamond Edition) on Blu-ray format, digital download format and DVD in 2014. Specifically, with respect to the 2007 DVD the Gilkyson heirs alleged they were entitled to royalties for the use of "The Bare Necessities" in the film itself, the instrumental versions of "The Bare Necessities" that played when navigation menus were displayed, and a bonus feature in which the demo recordings of the Gilkyson-composed deleted songs played. As to the 2014 release, the Gilkyson heirs again alleged they were entitled to royalties for the use of "The Bare Necessities" in the motion picture and for use of music in certain bonus features, including a "Bear-E-Oke sing-along" that displayed the lyrics of "The Bare Necessity" over a clip of the motion picture in which the characters sing the song. The breach of contract allegations omitted any reference to the 1991 release of The Jungle Book in VHS format.

The cause of action for breach of the implied covenant of good faith and fair dealing, which had not been included in the

original complaint, was based on essentially identical allegations. The cause of action for declaratory relief requested a determination that the Gilkyson heirs were entitled to royalties in connection with sales of The Jungle Book and Gilkyson-composed songs on DVD, Blu-ray and via digital download or any similar medium.

The trial court again sustained Disney's demurrer, this time without leave to amend, and dismissed the lawsuit. The court ruled omission of allegations relating to the release of the film in VHS format created a sham pleading intended to avoid the limitations bar. In any event, the Gilkyson heirs' claims accrued no later than 2007 with the first release of DVDs; and thus their claim for royalties, filed well after the expiration of the four-year statute of limitations applicable to written contracts, was time-barred. With respect to the cause of action for breach of the implied covenant of good faith and fair dealing, the trial court sustained Disney's demurrer not only on the ground the claim was duplicative of the breach of contract claim and barred by the statute of limitations, but also on the ground its order granting leave to amend after Disney's demurrer to the original complaint was sustained did not permit the Gilkyson heirs to add a new cause of action.

We reversed the judgment of dismissal, holding the continuous accrual doctrine applied to the Gilkyson heirs' contract claims. (*Gilkyson v. Disney Enterprises, Inc.* (2016) 244 Cal.App.4th 1336, 1342 (*Gilkyson I*).) "Disney's obligation to pay royalties based on its licensing or other disposition of the mechanical reproduction rights to Gilkyson's songs was unquestionably a continuing one. . . . The result is that, while portions of the Gilkyson heirs' contract claim are undoubtedly

8

time-barred, the action is timely as to those breaches occurring within the four-year limitations period preceding the filing of the original lawsuit." (*Id.* at p. 1343, fn. omitted.)[4] We declined to reverse the order sustaining the demurrer to the cause of action for breach of the implied covenant of good faith and fair dealing, however, explaining, "[T]he Gilkyson heirs provide no argument on appeal to challenge that alternate justification for sustaining the demurrer to this cause of action." (*Id.* at p. 1347.) We left it for the trial court to decide whether to grant leave to the Gilkyson heirs to add that cause of action if it was requested following remand. (*Ibid.*)

   4. *The Gilkyson Heirs' Motion for Leave To File a Second Amended Complaint*

Our remittitur issued on June 2, 2016. The Gilkyson heirs moved for leave to file a second amended complaint, which would have expanded their contract claim to include Gilkyson-composed songs for films other than The Jungle Book and alleged a new cause of action for breach of the covenant of good faith and fair dealing, a year later, on June 20, 2017. The trial court denied the motion, citing the Gilkyson heirs' unwarranted delay, Disney's

---

[4] In reversing the judgment in favor of Disney we observed, "Whether that continuing obligation was breached by Disney's failure to pay royalties based on the use of Gilkyson's songs in DVDs and similar home entertainment or audiovisual media, as the Gilkyson heirs allege, is not the question presented in this appeal." (*Gilkyson I*, *supra*, 244 Cal.App.4th at p. 1343, fn. 4.) We also observed the contract language at issue "may ultimately require extrinsic evidence to determine its scope." (*Id.* at p. 1345.)

pending summary judgment motion and the approaching trial date.

     5.  *Disney's Motion for Summary Judgment*

As the trial court noted, the month before the Gilkyson heirs' motion for leave to amend, Disney had moved for summary judgment.  Disney's motion was principally premised on its position that, in 1963 when the Gilkyson contracts were executed, as well as currently, "the term 'mechanical reproduction' refers to audio-only uses and not to audiovisual uses such as in motion picture or other uses involving sound and images, whether on film or on digital formats such as DVDs."  Based on that definition, Disney advanced two related arguments:  "1.  The complained of uses are on audiovisual media—media on which both sounds and visual representations are fixed—and therefore, are not mechanical reproductions that bear royalties; [¶]  2.  The complained of uses constitute audiovisual works, and therefore, are not mechanical reproductions that bear royalties."

Disney also asserted it was entitled to summary judgment on a third ground:  "3.  Royalties for mechanical reproductions are owed only when Disney's music publisher, Wonderland Music Company, Inc. ('Wonderland'), receives money on account of licensing or other disposition of the mechanical reproduction rights.  Because the complained-of uses on home entertainment products are not mechanical reproductions, Wonderland has never received any money for such uses, and therefore no royalties are due Plaintiffs."  Describing this ground in its supporting memorandum as "a separate, independent reason" for summary judgment, Disney explained, "For example, although Wonderland is paid for digital downloads of the movie *soundtrack* and other audio-only uses, it is not paid for digital downloads of

the *motion picture* or other audiovisual reproductions, regardless of the format in which they may be distributed. [Citation.] [¶] Because no amounts have been paid to Wonderland for the uses at issue, no royalties are due to Plaintiffs for those uses."[5]

---

[5] In her original declaration in support of the motion for summary judgment, Stacey Green, vice-president of finance for Disney Music Group, stated, "Licenses to exploit the mechanical reproduction rights to a composition, which give a user permission to use a composition in an audio-only format like a record album or CD, are distinct from what are commonly referred to as 'synchronization' or 'synch' licenses, which may be issued when a composition is used in audiovisual format (e.g., use of the composition in a third-party television commercial). However, when a composition is written for use in connection with a particular motion picture (as in the case of the Jungle Book Songs), Wonderland does not issue a synch license or collect a license fee for use of that composition in that motion picture or related motion pictures (e.g., sequels), or for bonus features that may appear on home entertainment releases of such motion pictures. Accordingly, Wonderland has not received synch fees when the Jungle Book Songs have been used in *The Jungle Book* motion pictures, including without limitation in home entertainment releases of those motion pictures or in bonus features included on such home entertainment releases."

In an amended declaration filed three weeks later (contemporaneously with a Disney document production), Green modified the second portion of this paragraph in her declaration to read, "However, when a composition is written for use in connection with a particular motion picture (as in the case of the Jungle Book Songs), *since at least July 15, 2009,* Wonderland's approach has been not to issue a synch license or collect a license fee for use of that composition in that motion picture or related motion pictures (e.g., sequels), or for bonus features that may appear on home entertainment releases of such motion pictures.

The Gilkyson heirs disputed Disney's interpretation of the scope of their right to royalties for exploitation of mechanical reproduction rights, contending synchronizing music with a series of related images in a device capable of playing back the audiovisual work is properly considered "mechanical reproduction," both in general terms (that is, under copyright

_____

Accordingly, *since at least that time,* Wonderland has not received synch fees when the Jungle Book Songs have been used in the *The Jungle Book* motion pictures, including without limitation in home entertainment releases of those motion pictures or in bonus features included on such home entertainment releases." (Italics added.)

Green's original declaration also described the following, apparent counter-example to her statement regarding synch licenses: "In 2007, Walt Disney Music Company was paid a fee to permit use of a version of 'The Bare Necessities' with revised lyrics in connection with a game included as a bonus feature on a home entertainment release of *The Jungle Book* motion picture. Although denominated a synchronization use license agreement, the fee was actually charged because the lyrics were rewritten, rather than for any synchronization license." Her amended declaration added the following language to this paragraph, "In addition, I understand that in or around 2003, Wonderland granted Walt Disney Television Animation a synch and performance license for use of 'The Bare Necessities' in connection with 'The Jungle Book 2,' a sequel to *The Jungle Book* motion picture, although such a license is not in keeping with Wonderland's approach as described in paragraph 7 above. In any event, based on my review, since at least July 15, 2009, neither Wonderland nor Walt Disney Music Company has had occasion to issue a synch license or collect a synch license fee in connection with *The Jungle Book*-related home entertainment releases that include any of the Jungle Book Songs."

12

law) and for purposes of the Gilkyson contracts—that is, that synchronization ("synch") rights are a subset of mechanical reproduction rights. Alternatively, the Gilkyson heirs argued, even if mechanical rights are limited to audio-only uses, certain of Disney's uses of the songs fell within that more restricted definition because they played over static images in navigation menus and underneath a series of storyboards in bonus features. At the very least, they insisted, the dispute over the proper interpretation of the term presented a triable issue of material fact.

As to Disney's contention mechanical reproduction royalties are due only if Wonderland has received a payment, the Gilkyson heirs argued it would be a breach of contract for Disney to have allowed other Disney affiliates to benefit from use of songs that Gilkyson wrote without paying his heirs the applicable royalties: "When Disney Enterprises, directly, or through one of its affiliates besides Wonderland, makes money or otherwise benefits from Gilkyson's songs by way of mechanical reproduction, including audiovisual and/or audio-only reproduction in home entertainment mechanical playback devices, they bear the royalty burden for receiving such benefit."[6]

---

[6] In its reply memorandum in support of the summary judgment motion, Disney emphasized, notwithstanding the discovery of several intra-Disney licensing agreements as described in Green's amended declaration, the Gilkyson heirs did not dispute that neither of Disney's music publishing entities had received any revenue for the use of the Gilkyson-composed songs in home entertainment releases during the limitations period (that is, since July 15, 2009).

13

The trial court denied Disney's motion. Although disagreeing with the Gilkyson heirs' assertion that synchronization rights are a subset of mechanical reproduction rights or that in 1963 the parties would have expected Gilkyson to be paid royalties for use of his songs in a home entertainment version of motion picture, the court found triable issues "at least with respect to the use of 'The Bare Necessities' in menus on digital media, i.e., menus in conjunction with still images." The court did not address Disney's argument that no royalties were due because no revenue had been received for exploitation of mechanical reproduction rights in home entertainment releases during the limitations period.

6. *The Gilkyson Heirs' Motion in Limine No. 5*

Prior to trial the Gilkyson heirs moved to exclude evidence and argument that Wonderland had received no compensation for exploitation of the mechanical reproduction rights in home entertainment releases, contending it was both irrelevant and prejudicial. Specifically, they argued allowing evidence or argument that Wonderland had no obligation to secure royalties from its affiliates and that, as a result, the Gilkyson heirs were not entitled to royalties "is an interpretation of the contracts that is not permitted under California law and should be excluded because it would confuse and mislead the jury." In opposition Disney responded it was entitled to present evidence and argument in support of its defense there was no breach of contract "because Defendants have no duty to pay royalties for uses for which Wonderland was not compensated."

At the hearing on the motion in limine, Disney's counsel reiterated its position, "I think the fact they didn't receive anything is dispositive of a breach of contract claim, but surely

14

we need to be able to point to that language and argue from the fact that Gilkyson—Wonderland did not receive any amount." The trial court rejected that position, "It's what they should have done and what they should have paid." Disney's counsel replied, "But we'll reserve on at least that issue, Your Honor."[7]

7. *The Jury Trial*

a. *The liability theory*

Through their own testimony based on their experience in the music industry and that of an industry-practice expert, the Gilkyson heirs at trial argued they were entitled to royalty payments based on four categories of use of Gilkyson-composed music or lyrics in Disney's home entertainment releases: audiovisual (synch) uses, including use of "The Bare Necessities" in the motion picture itself and in bonus features; songs used with static (non-moving) images; use of the demo sound recordings of deleted songs made by Gilkyson;[8] and use of the

---

[7] The following day, as the court and counsel considered Disney's motions in limine, Disney's counsel stated with respect to its motion to exclude the damage testimony of plaintiffs' expert, "We continue to maintain that Mr. Reith's approach does not comport with the language of the contract as it relates to net amounts received by the music publisher. I understand the court to have disagreed with us on this and, therefore, I assume this motion is denied . . . ." The court agreed with counsel, "Yeah, I think so."

[8] A master use license permits the licensee to use a specific copyrighted sound recording of a composition. (See 6 Nimmer on Copyright (2013) Master Recording Agreements, § 30.03, p. 30-77 ["[c]opyright ownership of the physical embodiment of the performance of a musical composition (e.g., a master recording) is

15

lyrics alone of "The Bare Necessities" in the Bear-E-Oke sing-along bonus feature in the 2014 Diamond Edition.  The theory of the case was that Wonderland should have charged its affiliated home entertainment division for each of these uses of Gilkyson-composed songs, music and lyrics.

Disney contested the Gilkyson heirs' expert testimony with its own experts, who opined that mechanical reproduction rights did not include use of songs in a motion picture or other audiovisual medium.  A Disney vice-president for licensing also testified, when it owned all the rights to a song in a motion picture, the policy was that Disney's music group, including Wonderland, would not charge an intercompany (that is, intra-Disney) fee for the home entertainment release of the motion picture.[9]  The Gilkyson heirs' expert had also conceded on cross-examination that in his experience at Warner Bros., when a motion picture studio owned all rights to an original song, as here, no intercompany fee was charged for use of the music on home entertainment media.

---

distinct from the ownership of the copyright in the musical composition itself"].)  The Gilkyson heirs argued they were entitled to royalties not only for the mechanical reproduction of the compositions but also for the use of Gilkyson's demo recordings of the deleted songs.

[9]     The witness testified he believed the 2003 licensing agreement in which Wonderland charged Walt Disney Television Animation a fee for using "The Bare Necessities" in The Jungle Book 2 should not have been considered a licensable event.

b. *Damages*

The Gilkyson heirs' damage expert calculated the amount of royalties that should have been paid on a per-use per-unit basis. That is, the expert counted the number of times any of the Gilkyson-composed songs were used on a given home entertainment release, assessed a royalty fee (50 percent of the royalty rate Wonderland should have charged) and multiplied the amount due per unit by the number of units sold. This method generated a total damage figure of $14,402,887.83 with more than $11 million in the audiovisual category. Disney's damage expert presented an alternate model, testifying, if Wonderland were to collect a fee for Disney's home entertainment division's use of the songs, it would have charged a one-time, lump-sum fee, rather than a continuing per-unit or per-use per-unit continuing royalty payment. Disney's witnesses testified such a lump-sum fee would be no more than $75,000 for "The Bare Necessities" and $1,000 or $2,000 for each of the songs that had not been used in the film. The Gilkyson heirs would be entitled to 50 percent of those sums.

c. *Motion for nonsuit*

After the Gilkyson heirs completed their case-in-chief, Disney moved for nonsuit on the ground the contracts required payment of royalties only as a percentage of the net amount received by Wonderland for exploitation of the mechanical reproduction rights and no testimony or other evidence had been presented that any such amounts had been received within the limitations period on account of the home entertainment releases at issue in the litigation. The court denied the motion, stating, "Oh, I don't think so."

17

The jury answered "yes" as to both Disney Enterprises and Wonderland to the question on the special verdict form, "Did a Defendant fail to pay royalties to Eliza Gilkyson, Tony Gilkyson and Nancy Gilkyson that the contract required them to pay, arising from . . . 'the licensing or other disposition of the mechanical reproduction rights in and to material so written' by Terry Gilkyson?"

The damages question asked, "What amount, if any, do you find as damages arising from any or all of the following category of uses?" The question then directed the jury to indicate whether any damages awarded had been calculated on per-use per-unit, per-unit, or lump-sum basis. The jury awarded total damages of $350,000: nothing for audiovisual uses and master uses of demo sound recordings; $300,000 on a lump-sum basis for song uses with static images; and $50,000 on a lump-sum basis for the use of lyrics in Bear-E-Oke.

8. *The Trial Court's Determination of the Declaratory Relief Cause of Action*

Immediately after the jury returned its verdict and was excused on May 11, 2018, the court stated, "So based on the verdict, I don't think there's anything else for us to do, is there?" The following exchange then took place:

"MR. BARKER [counsel for the Gilkyson heirs]: Well, there's the dec relief they awarded in two of the categories.

"THE COURT: Lump sum though.

"MR. BARKER: Lump sum, but that's past damages; right? So going forward, if they sell another DVD with those units on there, what do we get?

"MR. RANSOM [counsel for Disney]: Your Honor, That's not the way the evidence was presented. The evidence was

18

presented that the lump-sum alternative was a one-time fee for all uses of any sort.

"MR. BARKER:  Well, based on what Mr. Zajic—

" . . . . [an exchange between the court and the court reporter]

"MR. BARKER:  Actually, the testimony throughout the trial, the way the defendants presented it was this lump sum could be for each event that comes along.  There wasn't a lump-sum buyout.  They presented it specifically as a—

"THE COURT:  I think we'd better have this briefed.

"MR. RANSOM:  That's fine, Your Honor."

There followed a year with multiple rounds of briefing, hearings and tentative rulings by the court concerning the proper scope of the Gilkyson heirs' declaratory relief cause of action, whether the jury's verdict that Disney had no liability for audiovisual uses of the Gilkyson compositions and master uses of the demo sound records was merely advisory, the propriety of any award of damages for future home entertainment sales and the appropriate method of calculating damages, if any.  The Gilkyson heirs argued Disney had an ongoing obligation to pay royalties in the future for mechanical reproduction of Gilkyson-composed songs, the jury's award of zero damages for audiovisual use of "The Bare Necessities" did not bind the court in the equitable proceeding, and the court should declare a per-use per-unit rate of compensation for any future exploitation of the material.  Disney's position was that the jury verdict was binding as to which categories of use were compensable under the contracts and that the lump-sum award covered potential future sales.

On June 21, 2019 the court issued its final ruling on the matter, "adopt[ing] the explicit and implicit findings of the jury

as set forth in the Special Verdict of May 11th, 2018," and awarding the Gilkyson heirs future damages of $699,316.40. The court ordered payment only for the two categories of use for which the jury had awarded damages. As for its calculation of future royalties, based on the jury instruction that damages were for the period "July 15, 2009 and continuing to the present time," the court determined the jury's lump-sum right-to-use award had been limited to that time period, rejecting Disney's argument it would have made a single payment for all time. The court also ruled Disney's argument it could stop compensable uses in the future was "irrelevant because the breach had already occurred according to the jury's findings and the only question is compensation for the expected royalties using the damage model the jury used."

The court reasoned, in light of its instruction, the jury award had been based on 31 three-month quarters (seven years, nine months), which equated to $9,677.42 per quarter for song uses with static images and $1,612.90 per quarter for use of the lyrics in Bear-E-Oke. The court found it likely that future generations would have continuing interest in the "collaborative audio and visual creations at issue here and will acquire access to them in various manners," but that a looking-forward damage calculation had to include "the very real likelihood of decreased value over time." Using those assumptions, the court calculated damages in six-year periods for what it determined was the life of the copyrights, starting with the total jury award of $350,000 for 2018-2024, the initial post-verdict period, and decreasing that amount by 50 percent for each successive six-year period, ending with $683.59 for the final three years, 2081-2083.

Judgment was entered on June 21, 2019.

9. *Postjudgment Proceedings*

Following entry of judgment, the Gilkyson heirs moved for an award of prejudgment interest and separately for a new trial on the issue of damages or for additur in the two categories of use as to which the jury and the court had awarded damages, challenging the lump-sum methodology, as well as the amount of both the jury's verdict and the court's additional award. The court denied both motions.[10]

As to prejudgment interest, the court found damages as found by the jury were not "certain or capable of being made certain by calculation" as required for an award of prejudgment interest (Civ. Code, § 3287, subd. (a)) because royalties from exploitation of mechanical reproduction rights in various new media were not contemplated in the parties' 1963 agreements and were not reasonably ascertainable as to amounts absent substantial litigation.

As to the motion for a new trial or additur, the court noted the Gilkyson heirs' expert had agreed the lump-sum settlement method advanced by Disney had been used by him in his position at Warner Bros. with respect to song usage in new media. After pointing out the jury's award was nearly 10 times the lump sum suggested by Disney's expert, the court found that award was supported by the evidence. Concerning its own assessment of future damages, the court explained, "[T]he law frequently will award future damages as some multiple of past damages. Using a two times multiple, given the uncertainty of any future uses at all, the court considered that $700,000.00 would be a fair and

---

[10] The court granted in part Disney's postjudgment motion to tax costs.

reasonable figure more or less in line with what the jury had found."

Disney filed a timely notice of appeal, and the Gilkyson heirs filed a timely notice of cross-appeal.

## DISCUSSION

1. *Principles of Contract Interpretation; Standard of Review*

Disney contends, pursuant to paragraph 6(c) of its 1963 agreements with Gilkyson, the Gilkyson heirs' royalty rights are limited to 50 percent of the "net amount received by our music publisher" for exploitation of the mechanical reproduction rights in the material Gilkyson had composed. Because no such amounts were received by Wonderland (or any other Disney affiliate) for licensing those rights for the home entertainment releases at issue in the lawsuit within the governing limitations period, Disney argues the trial court erred in denying its motion for summary judgment and its motion for nonsuit, both of which advanced this contract interpretation. The Gilkyson heirs disputed this interpretation of the contract, as did the trial court, which, as discussed, instructed the jury, "Plaintiffs claim damages for amounts they contend should have been collected and shared with them based on the use of the Jungle Book songs in home entertainment releases after the period of July 15, 2009 and continuing to the present time."

Absent any conflict in extrinsic evidence, we review de novo issues regarding the proper interpretation of a contract. (See *City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395; *Garcia v. Truck Ins. Exchange* (1984) 36 Cal.3d 426, 439 ["[i]t is solely a judicial function to interpret a written contract unless the interpretation turns upon the

22

credibility of extrinsic evidence, even when conflicting inferences may be drawn from uncontroverted evidence"]; *Hanna v. Mercedes-Benz USA, LLC* (2019) 36 Cal.App.5th 493, 507 ["in the absence of any conflict in extrinsic evidence presented to clarify an ambiguity," written agreements are interpreted de novo].)[11]

The fundamental goal of contract interpretation is to give effect to the mutual intention of the parties as it existed at the time they entered into the contract. (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 288; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264; see Civ. Code, § 1636.) That intent is interpreted according to objective, rather than subjective, criteria. (*Brown v. Goldstein* (2019) 34 Cal.App.5th 418, 432; *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126 (*Wolf*).) When the contract is clear and explicit, the parties' intent is determined solely by reference to the language of the agreement. (*Brown*, at p. 432 ["[o]rdinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the

---

[11] Disney discussed the de novo standard of review in its opening brief, citing this court's opinion in *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107 for the well-established principle that interpretation of a written instrument is solely a judicial function when based on the words of the instrument alone or when there is no conflict in the extrinsic evidence, even when conflicting inferences may be drawn from the undisputed extrinsic evidence (*id.* at pp. 1126-1127), and for our holding that, when interpretation of the contract presents a question of law, the court of appeal will decide it de novo, even if the trial court erroneously submitted the question to the jury (*id.* at pp. 1134-1135). The Gilkyson heirs' argument Disney failed to sufficiently identify the appellate standard of review fails.

contract's terms"]; see Civ. Code, §§ 1638 ["language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity"], 1639 ["[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible"].)  The words are to be understood "in their ordinary and popular sense" (Civ. Code, § 1644); and the "whole of [the] contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."  (Civ. Code, § 1641.)

2. *Disney's Contract Argument Is Properly Before This Court*

The Gilkyson heirs advance several different reasons why we should decline to consider Disney's net receipts contract interpretation argument.  None has merit.

First, they assert Disney failed to properly raise this issue in the trial court, contending that in Disney's summary judgment motion the argument was derivative of its claim concerning the limited nature of mechanical reproduction rights (that is, Disney argued, because there was no exploitation of mechanical reproduction rights in the home entertainment releases, Wonderland had collected no licensing fees).  But the heading for this portion of Disney's memorandum of points and authorities in support of summary judgment plainly stated the issue in broader terms:  "Defendants are entitled to summary judgment because the contracts limit royalties to those uses for which Wonderland received money."

The Gilkyson heirs perhaps misunderstood Disney's argument, asserting in their opposition memorandum that, if a Disney affiliate other than Wonderland received licensing fees from the home entertainment division for exploitation of the

24

mechanical reproduction rights, they would still be entitled to a share of royalties under the agreements. However, no evidence was presented, either at the time of the summary judgment motion or at trial, that any such fees were ever collected by any Disney affiliate during the limitations period. Moreover, elsewhere in their opposition the Gilkyson heirs argued it would be contrary to the parties' intent to interpret the contracts to allow "self-dealing" that permitted any Disney entity to benefit from the use of mechanical reproduction rights without paying the Gilkyson heirs royalties—precisely the contract interpretation (without the pejorative descriptor) advanced by Disney. In any event, Disney's reply memorandum clearly defined the issue, emphasizing it was undisputed that neither of Disney's music publishing entities had received any revenue for the use of Gilkyson-composed songs in home entertainment releases during the limitations period and arguing, "The alleged failure to pay money 'received by [Disney's] music publisher' during the limitations period is a critical element of Plaintiffs' breach of contract claim. Because no amounts were received, there were no royalties to pay, and therefore no breach of the Contracts. Summary judgment should be granted on this basis as well."

Disney's argument concerning the proper interpretation of the Gilkyson heirs' right to recover royalties was subsequently addressed in connection with their motion in limine no. 5. As discussed, the trial court rejected Disney's analysis, stating the issue in the case was not about Wonderland's actual receipts. "It's what they should have done and what they should have paid."

The oral motion for nonsuit, although succinct, was also sufficient to once again identify the issue, which had previously been fully articulated before the court. The summary denial of the motion reflected the court's lack of agreement with Disney's motion, not any lack of understanding of the issue of contract interpretation it raised.

Similarly misplaced is the contention Disney is estopped from making its contract interpretation argument because Disney objected in discovery to producing certain financial information and thereafter successfully moved in limine to preclude the Gilkyson heirs from introducing evidence of the wealth of the Disney enterprise or the gross revenues or profits generated by the theatrical and home entertainment releases of The Jungle Book or its songs. Those objections were based precisely on Disney's claim that the only relevant financial information was the amount received by Wonderland for the songs' use (which was nothing), not the revenue generated by the Jungle Book franchise as a whole.

Finally, the Gilkyson heirs argue Disney waived its net receipts argument because it proposed the language instructing the jury that the plaintiffs sought damages for amounts they contend should have been collected for use of the Gilkyson-composed songs and did not request an instruction on its own contract interpretation theory. But Disney's position in the trial court, as it is on appeal, was that "net amount received" is not a disputed term that can only be construed after resolution of conflicting extrinsic evidence by the finder of fact; rather, the meaning of the contract was a question of law for the court, not the jury. As for the jury instruction that was given, having unsuccessfully advanced its legal position as to the meaning of

the contract on several occasions, Disney was entitled to propose instructions that embraced the court's view of the legal landscape.  (See *Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212-213 ["[a]n attorney who submits to the authority of an erroneous, adverse ruling after making appropriate objections or motions, does not waive the error in the ruling by proceeding in accordance therewith and endeavoring to make the best of a bad situation for which he was not responsible," internal quotation marks omitted]; *American Master Lease LLC v. Idanta Partners, Ltd.* (2014) 225 Cal.App.4th 1451, 1472-1473 [the doctrine of invited error does not apply when a party, while making the appropriate objections, acquiesces in a judicial determination].)

3. *The 1963 Contracts Did Not Obligate Disney To Collect Fees for Intercompany Exploitation of the Mechanical Reproduction Rights or To Pay Royalties to Gilkyson When Licensing Fees Were Not Charged*

a. *The plain language of the 1963 contracts gives Disney the right to exploit the mechanical reproduction rights without paying royalties*

The express language of the 1963 contracts limits the Gilkyson heirs' right to receive royalties to a share of the net amount received by Wonderland for licensing or other disposition of the mechanical reproduction rights to the material written by Gilkyson.  The first portion of paragraph 6 provides, whether any of the material is published by Disney (that is, Disney makes direct use of the music or lyrics) or licensed by Disney to be published in the media identified in subparagraphs (a), (b) and (c), Gilkyson was to receive royalties "as hereinbelow set forth."  Subparagraph (c) specifies with respect to mechanical reproduction rights that the royalties were to be "[a]n amount of money equal to Fifty Percent (50%) of the net amount received by

27

our music publisher on account of licensing or other disposition of the mechanical disposition rights" to the Gilkyson compositions.[12]

Paragraph 7 of the agreement reinforced the limited nature of Gilkyson's royalty rights. That paragraph specifically provided that Gilkyson had no right to royalties in connection with the exercise of any performance rights by Disney ("grand rights, dramatic rights, television rights and other performance rights, including the use of the material in motion pictures, photoplays, books, merchandising, television, radio and endeavors of the same or similar nature") and explicitly reaffirmed that Gilkyson "shall be entitled to receive as royalties only the moneys and/or royalties stipulated in and in accordance with Paragraph 6 above."

Significantly for purposes of the Gilkyson heirs' liability theory—that they are entitled to royalties based on fees that Wonderland should have collected—nothing in the language of the contracts imposed an obligation on Disney to exploit the mechanical reproduction rights at all or, if it elected to do so, to exploit them in any particular manner. Indeed, paragraph 10 states exactly the contrary: "Nothing contained in this agreement shall be construed as obligating us to publish, release, exploit or otherwise distribute any of the material, and the same shall be always subject to our sole discretion."

Based on the language of the 1963 contracts, Wonderland had the right to permit its home entertainment affiliate to use

---

[12] Although the contracts state net receipts by the music publisher, subsequently defined to be Wonderland, provide the measure of the royalties due to Gilkyson, paragraph 13 authorizes payment of royalties by either Walt Disney Productions or the music publisher.

the Gilkyson-composed songs without charging an intercompany license fee and without incurring any liability to Gilkyson or his heirs when doing so.  (See *Lange v. Monster Energy Co.* (2020) 46 Cal.App.5th 436, 445 ["'[o]rdinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms'"]; *Wolf*, *supra*, 162 Cal.App.4th at p. 1126 [same].)  Had the parties intended that Disney would use its best efforts to exploit the mechanical reproduction rights in a manner that generated royalties for Gilkyson, the contracts would not have expressly granted Disney such unfettered discretion.  (See *Wolf*, at p. 1121 ["if the express purpose of the contract is to grant unfettered discretion, and the contract is otherwise supported by adequate consideration, then the conduct is, by definition, within the reasonable expectation of the parties"]; see also *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 374 ["'[t]he general rule [regarding the covenant of good faith] is plainly subject to the exception that the parties may, by express provisions of the contract, grant the right to engage in the very acts and conduct which would otherwise have been forbidden by an implied covenant of good faith and fair dealing,'" second brackets in original].)

The contrary plain-language interpretation advanced by the Gilkyson heirs is that the first portion of paragraph 6 (what they refer to as the preamble), which states Gilkyson is entitled to royalties whether the material he composed "be published by us or be licensed by us to be published," means royalties are due whether Wonderland receives money from licensing or a Disney affiliate exploits the mechanical reproduction rights directly without an intercompany fee.  That proposed interpretation of

29

the 1963 agreements would require us to disregard the express limiting language of paragraph 6(c). Yet we are obligated in construing a contract, if possible, to give effect to all of its provisions and to give meaning to the parties' choice of language. (*Flores v. Nature's Best Distribution, LLC* (2016) 7 Cal.App.5th 1, 9 ["[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other," internal quotation marks omitted]; see *Wolf*, *supra*, 162 Cal.App.4th at p. 1136; *Aozora Bank, Ltd. v. 1333 North California Boulevard* (2004) 119 Cal.App.4th 1291, 1296; see also Civ. Code, § 1641; Code Civ. Proc., § 1858.) Giving effect to the reference in the first portion of paragraph 6 to "as hereinbelow set forth" and to the net receipts language in paragraph 6(c), as well as to the grant of sole discretion to Disney to determine whether and how to exploit the mechanical reproduction rights, requires that we reject the Gilkyson heirs' construction of the agreements as unreasonable. (See generally *Wolf*, at pp. 1121-1123 [no obligation to pay royalties based on licensing characters for promotional benefits in lieu of monetary consideration where contract provided royalties were based on "gross receipts" and Disney had full discretion over whether to charge for licensing rights].)

> b. *The Gilkyson heirs introduced no extrinsic evidence that supported a different interpretation of the contracts*

To bolster their plain-language claim, the Gilkyson heirs contend extrinsic evidence confirmed their proposed interpretation of the contracts, pointing out that Wonderland and other Disney music publishing subsidiaries had issued licenses for Disney affiliates' use of "The Bare Necessities" in home

30

entertainment media in periods prior to July 15, 2009. (Cf. *City of Hope National Medical Center v. Genentech, Inc.*, *supra*, 43 Cal.4th at pp. 393-394 [a party's predispute, post-contracting conduct is powerful evidence of that party's intent and understanding of the contract at the time it entered into the agreement]; *Crestview Cemetery Assn. v. Dieden* (1960) 54 Cal.2d 744, 753-754 [same].) That evidence, however, does not in any way indicate that Disney was obligated to do so by the terms of the 1963 agreements and is not inconsistent with Disney's position that the Gilkyson heirs were not entitled to royalties when Wonderland or the other publishing subsidiaries exercised their right not to require such a license.[13]

The Gilkyson heirs' other extrinsic evidence is equally unpersuasive. The testimony of their industry expert cited in the combined respondents' brief and cross-appellants' opening brief included only the expert's own interpretation of the contract language ("it talks about licensing, which could be involving the music publisher or other disposition, which could be exploitation done by Disney itself"), not admissible parol evidence of industry custom or practice. (See *Summers v. A.L. Gilbert Co.* (1999)

---

[13] Because the existence of earlier intercompany licenses for the mechanical reproduction rights was undisputed, interpretation of the contracts remained a question for the court despite the parties' disagreement as to the inferences to be drawn from that evidence. (See *City of Hope National Medical Center v. Genentech, Inc.*, *supra*, 43 Cal.4th at p. 395; *Garcia v. Truck Ins. Exchange*, *supra*, 36 Cal.3d at p. 439; *Wolf*, *supra*, 162 Cal.App.4th at p. 1134 ["[t]here was no 'conflict' in the evidence of Disney's predispute conduct, and thus no factual issue for the jury to resolve"].)

69 Cal.App.4th 1155, 1180 [expert opinion on the legal interpretation of contracts is inadmissible]; *Cooper Companies v. Transcontinental Ins. Co.* (1995) 31 Cal.App.4th 1094, 1100 ["the meaning of the policy is a question of law about which expert opinion testimony is inappropriate"]; cf. *Ermolieff v. R.K.O. Radio Pictures, Inc.* (1942) 19 Cal.2d 543, 550 ["while words in a contract are ordinarily to be construed according to their plain, ordinary, popular or legal meaning, as the case may be, yet if in reference to the subject matter of the contract, particular expressions have by trade usage acquired a different meaning, and both parties are engaged in that trade, the parties to the contract are deemed to have used them according to their different and peculiar sense as shown by such trade usage"]; *Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1357 [evidence regarding trade usage and custom is admissible to prove an interpretation to which the agreements at issue were reasonably susceptible in the entertainment industry context].)

The testimony the Gilkyson heirs cite from Disney's vice-president of music licensing, Dominic Griffin, is equally unhelpful to their position. Griffin testified in response to a hypothetical question that, if a Disney entity sold sheet music for a Gilkyson-composed song, Gilkyson would get paid 5 cents even if no license fee had been collected.[14] Even if this were not an inadmissible personal opinion on the meaning of the contracts, paragraph 6(a) provides for payment of a royalty of 5 cents for each copy of sheet

---

[14] The Gilkyson heirs' counsel asked, "In that sense, it doesn't really matter which Disney entity licensed or didn't license it. If the exploitation occurred, the sheet music was sold, Terry Gilkyson should get paid?" Griffin answered, "Yes."

music sold by Disney and paid for at wholesale in the United States and Canada; it does make the royalty payment dependent on net sums received by the music publisher, as does paragraph 6(c).

Finally, the testimony of Nancy Gilkyson (a music industry executive) that it appeared from her review of the records that Disney "played shell games with the money," and the testimony of the Gilkyson heirs' entertainment industry damages expert that Disney benefited from not having the expense of paying the Gilkyson heirs' royalties when Disney exploited mechanical reproduction rights in home entertainment media without an intercompany license, while unquestionably central to the Gilkyson heirs' narrative, do not constitute extrinsic evidence of the parties' intent when entering the 1963 contracts.

    c. *No principle of California law justifies disregarding the parties' objective manifestation of their intent as expressed in the language of the contracts*

While disclaiming any reliance on the implied covenant of good faith and fair dealing[15]—that is, insisting they are not arguing Disney had an implied obligation to exercise its discretion with respect to the manner in which it exploited the mechanical reproduction rights so as not to unfairly deprive Gilkyson and his heirs of their share of royalties (see, e.g., *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.*,

---

[15] As discussed, the trial court denied leave to file a second amended complaint that would have added a cause of action for breach of the implied covenant of good faith and fair dealing. The Gilkyson heirs do not contend a separate cause of action is unnecessary for the plaintiff in a contract action to assert a breach of the implied covenant.

*supra*, 2 Cal.4th at p. 372 [the implied covenant "finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith"])—the Gilkyson heirs cite several general provisions of California law to argue Disney's net receipts interpretation of its 1963 agreements must be rejected. As they state, Civil Code section 3512, a maxim of jurisprudence, provides, "One must not change his purpose to the injury of another"; and Civil Code section 3521, another maxim, reads, "He who takes the benefit must bear the burden."[16] More specific to contract interpretation, Civil Code section 1648 provides, "However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract." And Civil Code section 1652 provides, "Repugnancy in a contract must be reconciled, if possible, by such an interpretation as will give some effect to the repugnant clauses, subordinate to the general intent and purpose of the whole contract."[17]

Taken together, the Gilkyson heirs argue, these provisions mandate an interpretation of the 1963 contracts that is faithful to the underlying purpose of the parties' agreement, which was for Disney to obtain songs to exploit and for Gilkyson to receive

---

[16] The maxims of jurisprudence "are intended not to qualify any of the foregoing provisions of [the Civil Code], but to aid in their just application." (Civ. Code, § 3509.)

[17] "Repugnancy" in this context means a direct conflict among clauses of a contract (see, e.g., *In re Marriage of Williams* (1972) 29 Cal.App.3d 368, 379), not general unfairness, as the Gilkyson heirs argued in the trial court.

compensation, including royalties, for that exploitation.  As discussed, however, the construction of the contracts proposed by the Gilkyson heirs would effectively require us to rewrite the express language of the parties' agreement, which granted Disney sole discretion to determine how to exploit the rights it obtained from Gilkyson and limited Gilkyson's right to receive royalties from that exploitation to net receipts, as set forth in paragraph (c).  We are not authorized to do that.  (See *In re Mission Ins. Co.* (1995) 41 Cal.App.4th 828, 837-838 ["'[w]hen the language of a contract is plain and unambiguous it is not within the province of a court to rewrite or alter by construction what has been agreed upon'"]; see also *Third Story Music, Inc. v. Waits* (1995) 41 Cal.App.4th 798, 808 ["courts are not at liberty to imply a covenant directly at odds with a contract's express grant of discretionary power except in those relatively rare instances when reading the provision literally would, contrary to the parties' clear intention, result in an unenforceable, illusory agreement"]; see generally Civ. Code, §§ 1638, 1639.)

In sum, interpretation of the Gilkyson heirs' right to receive royalties for exploitation of the mechanical reproduction rights in Gilkyson-composed material—regardless of the parties' dispute as to the scope of those rights—was properly a question for the court; and Disney's net receipts interpretation of paragraphs 6 and 6(c) is the more reasonable construction of the contracts.  Accordingly, the trial court erred in denying Disney's motions for summary judgment and for nonsuit.  Judgment should have been entered in favor of Disney as a matter of law.

## DISPOSITION

The judgment is reversed, and the cause remanded with directions to enter a judgment in favor of Disney.  Disney is to recover its costs on appeal.

PERLUSS, P. J.

We concur:

SEGAL, J.

FEUER, J.